# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| GAREY E. LINDSAY, Regional Director of the Ninth Region of the National Labor Relations Board, for and on Behalf of the National Labor Relations Board, | : : : : : | Case No. 3:17-cv-126<br><br>Judge Thomas M. Rose |
| Petitioner, | : : | |
| v. | : : | |
| MIKE-SELL'S POTATO CHIP COMPANY, | : : : | |
| Respondent. | : | |

## ORDER DENYING PETITION FOR PRELIMINARY INJUNCTION UNDER SECTION 10(j) OF THE NATIONAL LABOR RELATIONS ACT (DOC. 1)

This case is before the Court on the Petition for Preliminary Injunction ("Petition") (Doc. 1) under Section 10(j) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 151-169, filed by Petitioner Garey E. Lindsay, Regional Director of the Ninth Region of the National Labor Relations Board ("Petitioner"), on behalf of the National Labor Relations Board (the "Board"). Petitioner seeks a preliminary injunction against Respondent Mike-sell's Potato Chip Company ("Mike-sell's") pending the final disposition of administrative proceedings before the Board. (Doc. 1)

Petitioner alleges that Mike-sell's sold four distribution routes for its products to independent contractors in violation of Sections 8(a)(1) and (5) of the Act. Specifically, Petitioner argues that Mike-sell's did not comply with an obligation to bargain with the International Brotherhood of Teamsters, General Truck Drivers, Warehousemen, Helpers, Sales and Service, and Casino Employees, Teamsters Local Union No. 957 (the "Union") before selling

the routes. Petitioner also argues that Mike-sell's refused to provide the Union with information relevant to the sale of the routes. Pending the Board's determination of whether these actions violated the Act, Petitioner asks the Court to enter a preliminary injunction that would require Mike-sell's to rescind its sale of the four routes, provide information relevant to the sale to the Union, and bargain with the Union regarding the sale in good faith. (Doc. 1 at 1.)

Pursuant to an expedited briefing schedule, Mike-sell's filed an Answer (Doc. 3) and Memorandum in Opposition (Doc. 5) to the Petition. The Union filed a Motion to Intervene in this matter, which motion the Board opposed. (Docs. 4, 9.) The Court denied the Union's Motion to Intervene, but granted the Union leave to file an amicus curiae brief. (Doc. 13.) On May 12, 2017, the Court held a hearing, at which the parties presented evidence and argument. At the hearing, the Union notified the Court that it decided not to submit an amicus curiae brief. This matter is therefore fully briefed and ripe for the Court's determination.

**I.     BACKGROUND**

   **A. The History of Mike-sell's Distribution of its Products**

Mike-sell's is a privately-held manufacturer of snack foods headquartered in Dayton, Ohio. (Doc. 5-1 at ¶ 3.) Mike-sell's manufactures and packages snack products at its Dayton plant and then distributes them to retailers in Ohio, Indiana, Kentucky, Illinois, Michigan, and Pennsylvania through the help of route sales drivers ("drivers") and independent distributors ("distributors"). (*Id.* at ¶ 4.) Drivers are employed as part of the Company route sales division. (*Id.* at ¶ 5.) They are commissioned employees of Mike-sell's whose duties include loading trucks, traveling to customer locations, stocking shelves, taking retail inventories and replenishing product, performing point-of-sale marketing, and rotating and removing unsold or expired product. (*Id.* at ¶ 5.) In contrast, distributors are independently-owned businesses that take on the

entire risk of loss by choosing the type and amount of product to market, buying that product outright from Mike-sell's, preparing merchandise displays, delivering, and re-selling the product to customers in order to recoup their own costs and make a profit. (*Id.* at ¶ 6.)

For sales territories or "routes" serviced by distributors, Mike-sell's sells the right to market its product within a specified geographic area, and the distributors purchase Company product up-front and are thereafter the owners of that inventory and all the liability that comes with it. (*Id.*) Historically, distributors have been responsible for servicing a far greater sales territory—and distributing far more Company product—than drivers. (*Id.* at ¶ 7.) Unlike Mike-sell's drivers, however, distributors are not required to follow any particular route or schedule, or to service any particular customer, within their individual sales territory. (*Id.*)

Company drivers are represented by the Union. (Doc. 1 at 4.) From November 17, 2008 to November 17, 2012, their employment was governed by a labor agreement. (Doc. 5-1 at ¶ 8.) From November 18, 2012 to June 12, 2013, drivers worked under a last, best, and final offer (the "Original Offer") unilaterally implemented by Mike-sell's. (*Id.* at ¶ 9.) Under well-established labor law, an employer is entitled to institute its last, best and final offer of employment terms after reaching an impasse in negotiations with its employees. *Mike-Sell's Potato Chip Co. v. NLRB*, 807 F.3d 318, 323 (D.C. Cir. 2015). Although Mike-sell's believed that it had reached an impasse with the Union, the Board later determined that its unilateral implementation of the Original Offer was unlawful. *Id.* Since June 13, 2013, drivers have worked under a revised last, best and final offer (the "Revised Offer") implemented by Mike-sell's. The lawfulness of the Revised Offer, which the Union disputes, has not been determined by the Board. (Doc. 5 at 8 n. 3.)

Since about 2006, Mike-sell's has incurred significant losses. (Doc. 5-1 at ¶ 11.) As a

result, it decided to change its business plan to focus more on manufacturing and branding quality products, which it believes are its biggest strengths and most promising areas for growth and profitability. (*Id.* at ¶ 12.) In addition, because its route sales division has lost considerable money for more than a decade, Mike-sell's reduced the size of that division by selling certain routes to distributors. (*Id.* at ¶ 13-14.)

Since as early as 2002, Mike-sell's has sold over 36 routes to independent distributors. (5/12/17 Transcript at 74-75.) When selling routes, Mike-sell's practice was to notify the Union of its decision and then offer to bargain over the effects of the closure. The Union typically did not object to the sale or file any grievance challenging the sale. (Doc. 5-2 at ¶ 4-8.) In November 2011, however, Mike-sell's decided to sell a driver-serviced route in Marion, Ohio that was losing approximately $1,100.00 per week. (*Id.*, Attachment 1 at 9.) As per Mike-sell's practice and the Union's prior labor agreement, the driver who serviced the route was permitted to "bump" into another route based on her seniority. (*Id.* at 10.) The driver selected a route, but ultimately was unhappy with her choice because of the increased commute required to pick up product. (*Id.*) The driver filed a grievance with the company claiming that the failure to bargain over the sale of the Marion route violated the Union's labor agreement. (*Id.*)

The driver's grievance resulted in an arbitration between Mike-sell's and the Union regarding the propriety of Mike-sell's decision to sell the Marion route. (*Id.*) A threshold issue at the arbitration was whether the sale should be characterized as either the subcontracting or the transfer of the work to an independent distributor. The Union argued that Mike-sell's was not permitted to subcontract without complying with the Union's bargaining rights under the labor agreement. (*Id.* at 10-11.) Mike-sell's argued that the Union's rights were not implicated because selling the route transferred both the revenue and the risk of loss to the distributor. (*Id.* at 13.)

The arbitrator rejected the Union's position. He noted that the company's action did not resemble a typical subcontracting scenario where "the exact work that had been done by bargaining unit personnel is hired out to a third party." (*Id.* at 16.) Instead, Mike-sell's had "transferred the entire business enterprise to a third party." (*Id.* at 17.) The arbitrator further found that Mike-sell's did not sell the route solely to reduce costs, which would lend itself to a simple comparison of Union labor costs against those of a subcontractor. (*Id.*) Rather, by selling the complete business represented by the route, Mike-sell's had "reduced its involvement to that of a supplier." (*Id.*) The upside *and* downside belonged to the independent distributor, therefore analysis of the sale simply in terms of a reduction of Mike-sell's costs would not be appropriate. (*Id.*)

Having determined that sale of the route did not constitute subcontracting, the arbitrator considered whether Mike-sell's violated its agreement with the Union. (*Id.* at 21.) The arbitrator found that the agreement contemplated situations in which a route may be eliminated because (a) the company withdraws from the market, (b) routes are merged with each other, and (c) a route is sold to a third party. (*Id.* at 20.) In each instance, the agreement provided that the displaced driver would have certain rights, including the right to bump another driver with lower seniority. The arbitrator found that Mike-sell's provided notice to the Union and honored the driver's rights. The arbitrator observed that if the agreement were construed to prohibit Mike-sell's action, "the Company would have a situation where it would be forced, by contract, to continue a business activity that loses money every day." (*Id.* at 18.) "Absent clear contract language," the arbitrator concluded, "it must be found that the management right to control distribution, and determine profitability allows the action of the Company." (*Id.* at 20.)

After the arbitrator's decision, Mike-sell's driver-serviced routes continued to lose money. (Doc. 5-1 at ¶ 16.) Mike-sell's relied on the arbitrator's decision and its own understanding of it

5

legal obligations to eliminate over three dozen more routes. (*Id.* at ¶ 17.) It notified the Union of each sale and offered to bargain regarding any effects on Union drivers. (*Id.*) The Union neither requested to bargain nor filed a grievance or unfair labor practice charge to challenge the route eliminations. (*Id.*)

    **B. <u>The Events Leading to the Petition</u>**

In April 2016, Mike-sell's notified the Union that it was considering selling more routes to distributors. (*Id.* at ¶ 20.) The Union filed a grievance to challenge the possible sale of additional routes, citing several provisions of its expired labor agreement. (*Id.*)

On July 11, 2016, Mike Sell's notified the Union of its decision to sell a route covering the Xenia, Ohio area. (*Id.* at ¶ 21.) The Union neither demanded to bargain with Mike-sell's regarding this decision nor filed a grievance to specifically challenge it. (*Id.*)

On August 29, 2016, Mike-sell's notified the Union of its decision to sell two more routes covering territory in Bellbrook and Beavercreek, Ohio. (*Id.* at ¶ 22.) The Union filed a grievance to challenge the sale of both routes. (*Id.*) It also sent Mike-sell's a letter demanding to bargain over the decision to sell those routes and demanding the production of certain documents related to the routes. (*Id.*) On September 12, 2016, Mike-sell's notified the Union that it would neither engage in decisional bargaining over the sale of the routes nor produce the requested documents. (*Id.* at ¶ 23.) Mike-sell's stated that it would be willing to bargain over the effects of any route elimination and would provide documents relating to the issues that it deemed subject to mandatory bargaining. (*Id.* at ¶ 23.)

Also on September 12, 2016, Mike-sell's notified the Union of its decision to sell a route covering territory in Middletown and Springboro, Ohio. (*Id.* at ¶ 25.) In response, the Union filed a new grievance objecting to the sale of the Middletown/Springboro route and the other three

routes to be sold. (*Id.*) On September 14, 2016, the Union filed a charge with the Board alleging that Mike-sell's was engaging in unfair labor practices under Section 8(a)(1) and (5) of the Act. (Doc.1, Ex. 1.)

Mike-sell's sold the four routes at issue for a total of $127,400. (*Id.* at ¶ 26.) It projected that the income from the sales, when combined with the costs saved, would increase its net worth by almost 3.5% in the first year. The sales also reduced the time that managers had to spend working on the routes, freeing up their time for other tasks. (*Id.* at ¶ 29.)

Meanwhile, Petitioner was investigating the Union's charge. (Doc. 1 at ¶ 5.) On March 17, 2017, Petitioner issued a complaint and notice of hearing against Mike-sell's alleging violations of Section 8(a)(1) and (5) of the Act. (*Id.*) A hearing before an Administrative Law Judge ("ALJ") is scheduled for May 31, 2017. (*Id.*)

On April 12, 2017, Petitioner filed this action seeking a preliminary injunction against Mike-sell's pending resolution of the proceedings before the ALJ and Board. (Doc. 1.) Petitioner seeks an order requiring Mike-sell's to rescind the sale of the Xenia, Bellbrook, Beavercreek, and Middletown/Springboro routes, assign those routes to company drivers, provide information relevant to the sale of the routes, and bargain with the Union regarding the sale in good faith. (*Id.*)

## II. <u>LEGAL STANDARD</u>

Section 10(j) of the Act permits the Board, upon issuance of an administrative complaint alleging an unfair labor practice, to petition a district court for "such temporary relief or restraining order as it deems just and proper." 29 U.S.C. § 160(j). To be granted a preliminary injunction under this provision, the Board must carry two burdens. First, the Board must establish that "reasonable cause" exists to believe unfair labor practices occurred. *NLRB v. Voith Indus.*

*Servs., Inc.*, 551 F. App'x 825, 827 (6th Cir. 2014). Second, it must show that entry of the injunction would be "just and proper." *Id.* The Sixth Circuit has advised that, "[s]ince unfair labor practice charges are to be adjudicated by the Board, subject to judicial review, courts must be mindful not to adjudicate the merits of such charges in deciding whether to grant relief in the ancillary § 10(j) proceedings." *Id.* (citing *Gottfried v. Frankel*, 818 F.2d 485, 492 (6th Cir. 1987); *Schaub v. W. Mich. Plumbing & Heating, Inc.,* 250 F.3d 962, 969 (6th Cir. 2001)).

### III. ANALYSIS

#### A. Whether the Board Has Established "Reasonable Cause" to Believe That Mike-sell's Violated Section 8(a)(1) and (5) of the Act

The burden of establishing reasonable cause is "relatively insubstantial." *Schaub v. W. Michigan Plumbing & Heating, Inc.*, 250 F.3d 962, 969 (6th Cir. 2001). Petitioner need only show that the Board's legal theory is "substantial and not frivolous" and that the facts of the case are consistent with that legal theory. *Id.* (quoting *Gottfried v. Frankel*, 818 F.2d 485, 493 (6th Cir.1987)).

Petitioner argues that there is reasonable cause to believe that Mike-sell's violated Section 8(a)(1) and (5) of the Act "by failing and/or refusing to notify and bargain with the Union over its decision to sell routes and by failing and/or refusing to provide requested information relating to the sales." (Doc. 1-1 at 8.) To establish an unlawful refusal to bargain, Petitioner must show that "there is an employment practice concerning a mandatory bargaining subject, and that the employer has made a significant change thereto without bargaining." *Bath Iron Works Corp.*, 345 NLRB 499, 501 (2005). To establish unlawful failure to provide information, Petitioner must show that the requested information "is potentially relevant and will be of use to a union in fulfilling its responsibilities as the employees' exclusive bargaining representative, including its grievance-processing duties." *UPS, Inc.*, 362 NLRB No. 22 (Feb.

8

26, 2015).

There is no dispute that the Act prohibits employers from refusing to bargain and refusing to provide information regarding a mandatory subject of bargaining. The question at the heart of this case is whether the sale of the four routes was a mandatory subject of bargaining. Both parties acknowledge that the Supreme Court's decision in *First National Maintenance Corporation v. NLRB*, 452 U.S. 666 (1981) is relevant to the analysis of this question.

In *First National Maintenance*, the issue was whether an employer's "economically-motivated decision to shut down part of the business" was a mandatory bargaining subject. *Id.* at 680. First National Maintenance, the employer, provided housekeeping and cleaning services for commercial customers in New York City. *Id.* at 668. While First National Maintenance was attempting to modify an unprofitable contract with a nursing home, its employees working at that location voted to select a union as their bargaining agent. *Id.* at 669. After the union's certification, the union's vice president sought a meeting with First National Maintenance, but it never responded to the request. *Id.* About two weeks later, First National Maintenance terminated its contract with the nursing home and informed the employees that had been working there that they would be discharged. *Id.*

The union immediately contacted First National Maintenance to request a delay for the purpose of bargaining. *Id.* Rejecting the request, First National Maintenance explained that the contract's termination was "purely a matter of money, and final" and maintaining the contract any longer would be "prohibitively expensive." *Id.* at 669-70. Based on these events, the union filed an unfair labor practice charge alleging violations of Sections 8(a)(1) and (5) of the Act. After a hearing, the ALJ made findings in the union's favor, which the Second Circuit Court of Appeals affirmed (although adopting a different analysis). *Id.*

Granting certiorari, the Supreme Court acknowledged that "[a] union's interest in participating in the decision to close a particular facility or part of an employer's operations springs from its legitimate concern over job security." *Id.* at 681. On the other hand, "[m]anagement's interest in whether it should discuss a decision of this kind is much more complex and varies with particular circumstances." *Id.* at 682. Where labor costs are a significant factor in the decision to close operations, management might have an incentive to confer with the union. In other circumstances, conferring with the union might have a deleterious impact on the company due to a "great need for speed, flexibility and secrecy." *Id.* On balance, the Supreme Court found that "the harm likely to be done to an employer's need to operate in deciding whether to shut down part of its business purely for economic reasons outweighs the incremental benefit that might be gained through the union's participation in making the decision." *Id.* at 686. It therefore held that First National Maintenance's decision to close part of its business was not a mandatory bargaining subject under the Act. *Id.*

The Supreme Court explained the limitations of its holding by noting the particular facts before it. First National Maintenance "had no intention to replace the discharged employees or to move that operation elsewhere." *Id.* at 687. Its "sole purpose was to reduce its economic loss, and the union made no claim of antiunion animus." *Id.* The Supreme Court noted that the primary dispute with the nursing home was the size of the management fee—a subject over which the union had no authority or control. *Id.* In addition, although the nursing home contract did not involve investment of a large amount of capital, it nonetheless represented a "significant change in petitioner's operations, a change not unlike opening a new line of business or going out of business entirely." *Id.* at 688. These facts distinguished the case from others where the Supreme Court previously found an employer to have an obligation to bargain, such as in a case

involving the decision to subcontract work previously performed by employees. *Id.* (citing *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203 (1964)).

Here, the alleged facts appear to fall within the Supreme Court's holding in *First National Maintenance*. Mike-sell's sold the four routes to independent businesses; it did not replace the employees with a substitute workforce. Mike-sell's based its decision on a desire to reduce the size of an unprofitable division of its business, and focus its efforts on manufacturing and branding. (Doc. 5-1 at ¶ 12-14.) There is no allegation of antiunion bias. The decision to sell the routes—transferring the profits and risk of loss of that business to third parties—represents a significant change in Mike-sell's operations.

Petitioner argues that the rule announced in *First National Maintenance* does not apply because Mike-sell's had no need for "speed, flexibility, and secrecy" in selling its routes. (Doc. 1-1 at 9 (quoting *First National Maintenance*, 452 U.S. at 682)). The Supreme Court did not premise application of the rule, however, on whether the employer has a need for speed, flexibility, and secrecy. It noted that the overarching purpose of the Act is to foster "in a neutral manner" a system in which the conflict between the union's interests and management's interests may be resolved. *First National Maintenance*, 452 U.S. at 681-2. The Supreme Court then considered circumstances in which bargaining would further that purpose, such as where labor costs are a significant factor, and circumstances in which it would not, such as where management greatly needed speed, flexibility, and secrecy due to business opportunities or exigencies.

Moreover, the Supreme Court was critical of the Second Circuit's adoption of a "presumption analysis" to address when bargaining would be required. The Second Circuit had held that the Act created a presumption in favor of mandatory bargaining, which would be

11

rebuttable "'by showing that the purposes of the statute would not be furthered by imposition of a duty to bargain,' for example, by demonstrating that 'bargaining over the decision would be futile,' or that the decision was due to 'emergency financial circumstances,' or that the 'custom of the industry, shown by the absence of such an obligation from typical collective bargaining agreements, is not to bargain over such decisions.'" *Id*. at 672 (quoting *First National Maintenance*, 627 F.2d at 601-2). One issue created by this rebuttable presumption, according to the Supreme Court, was that an employer "would have difficulty determining beforehand whether it was faced with a situation requiring bargaining or one that involved economic necessity sufficiently compelling to obviate the duty to bargain." *Id.* at 684. "If it should decide to risk not bargaining," the Supreme Court continued, "it might be faced ultimately with harsh remedies forcing it to pay large amounts of backpay to employees who likely would have been discharged regardless of bargaining, or even to consider reopening a failing operation." *Id.* at 684-5. The Supreme Court recognized that the union, too, "would have difficulty determining the limits of its prerogatives, whether and when it could use its economic powers to alter an employer's decision, or whether, in doing so, it would trigger sanctions from the Board." *Id.* at 685-6. These concerns caused the Supreme Court to reject the Section Circuit's rebuttable presumption in favor of a rule that the decision to shut down part of a business for economic reasons is not a mandatory subject of bargaining.

The Supreme Court's adoption of the rule was complicated, however, by the fact-specific limitations that it placed on its holding. These fact-specific limitations invite—although perhaps to a lesser extent—the very kind of speculation that the Supreme Court was concerned would be created by the Second Circuit's rebuttable presumption. As a case in point, Petitioner in this case also argues that the fact that Mike-sell's decided to sell the routes because they were unprofitable

"enhances the potential benefit of the union's participation in making the decision." (Doc. 1-1 at 9.) This argument resonates with the Supreme Court's observation in *First National Maintenance* that the union did not have any control over the management fee, which was the primary reason that the employer had to cancel the contract. Here, in contrast, Petitioner argues that the union had control of a major component of the routes' profitability—labor costs.

In response, Mike-sell's presented evidence that labor costs were not a significant factor in its decision to sell the routes. Phillip Kazer, Mike-sell's Executive Vice President of Sales and Marketing, testified that the company's distribution system was responsible for a large share of its losses because it is "an outdated business model that carries with it a high cost of overhead, both labor and nonlabor, as well as risk of loss." (5/12/17 Transcript at 106:5-7.) Despite this acknowledgment of labor costs, however, Kazer repeatedly testified that the company did not choose which routes to sell based on their relative profitability. (*Id.* at 110:18, 114:14, 118:13, 122:17, 134:7-11.) He further testified that the union could not have offered any labor concessions that would have caused the company to reconsider its decision to sell the routes. (*Id.* at 155:23 – 156:3.)

Yet, Mike-sell's management must have exercised some judgment in choosing which routes to sell because the company could not afford to convert all of its routes to independent distributors. Kazer testified that doing so was not an option because it would trigger a pension obligation in excess of $20 million. (*Id.* at 128:7-19.) Thus, it stands to reason that the company would have considered profitability to some extent when implementing its overarching change in strategy. It also does not make business sense, if the company's strategy is "to move away from high-risk, high loss areas and transfer that exposure to an independent distributor," for the company to keep the routes incurring the highest losses. (*Id.* at 155:5-10.)

Mike-sell's makes a persuasive argument in its memorandum that both the Board (including Region 9) and the Circuit Courts have already determined that the decision to convert drivers to independent distributors is not a mandatory subject of bargaining. (Doc. 5 at 18 (citing *NLRB v. Adams Dairy, Inc.*, 350 F.2d 108 (8th Cir. 1965); *Agencia De Publicaciones De Puerto Rico, Inc.*, 353 NLRB No. 68 at n. 9 (Dec. 24, 2008); *W. Virginia Baking Co.*, 299 NLRB 306 at 307-16, 325 (1990); *Johnson's Indus. Caterers, Inc.*, 197 NLRB 352, 355 (1972)).) Review of the caselaw cited by Mike-sell's, however, reveals subtle differences among the facts in the cases. For example, in *Adams Dairy*, the Eighth Circuit noted that there was "no evidence that collective bargaining, as traditionally understood, did not take place on the matters in dispute in this case." *Adams Dairy*, 350 F.2d at 114. Here, it is undisputed that Mike-sell's did not engage in collective bargaining over the decision to sell routes, although it has bargained over the effects of such decisions.

If the Court were to scrutinize the facts in this case against the facts in *First National Maintenance* and its progeny, it might reach the same conclusion that Mike-sell's did—that it was not required to bargain over its decision to sell the routes. Engaging in that analysis, however, would essentially result in an adjudication of the merits, which the Sixth Circuit has admonished district courts ***not*** to do when ruling on a § 10(j) petition. *Voith Indus. Servs.*, 551 F. App'x at 827. In any event, the mere fact that such analysis is necessary to resolve the key question in this case supports a finding that Petitioner has carried its "relatively insubstantial" burden of establishing reasonable cause to believe that a violation of the Act has occurred. *Schaub*, 250 F.3d at 969.

**B. <u>Whether Entry of a Preliminary Injunction Would Be "Just and Proper"</u>**

In order to obtain its requested relief, Petitioner also must show that entry of a

preliminary injunction would be just and proper.  The Sixth Circuit has explained that Congress allowed for injunctive relief under Section 10(j) of the Act "because in some cases the enforcement of a Board order after the Board's normal processes is ineffective to undo the effect of unfair labor practices."  *Fleischut v. Nixon Detroit Diesel, Inc.*, 859 F.2d 26, 30 (6th Cir.1988).  To determine if injunctive relief is "just and proper" in a particular case, a district court must determine whether "it is in the public interest to grant the injunction, so as to effectuate the policies of the National Labor Relations Act or to fulfill the remedial function of the Board." *Id.*  Thus, "[t]he goal of a § 10(j) injunction is to preserve the status quo pending completion of the Board's unfair labor practice proceedings."  *Schaub*, 250 F.3d at 970 (citing *Fleischut*, 859 F.2d at 30).  The relevant status quo is not necessarily the relative positions of the parties when the § 10(j) petition is filed; it is the status quo before the alleged violations occurred.  *Fleischut*, 859 F.2d at 30 n. 3.  This Court has discretion in determining whether or not the just and proper standard has been met, but it must explain the reasons for its determination.  *See Calatrello v. Automatic Sprinkler Corp. of Am.*, 55 F.3d 208, 214 (6th Cir. 1995); *Fleischut*, 859 F.2d at 30.

Here, the entry of Petitioner's requested injunctive relief would not be just and proper. Petitioner seeks an extremely broad injunction that would effectively provide all of the relief that it might obtain from the Board.  *Fleischut*, 859 F.2d at 30 (district court "must be careful that the relief granted is not simply functioning as a substitute for the exercise of the Board's power"). Mike-sell's would be required to terminate its contracts with the independent distributors who purchased the rights to the four routes, purchase or lease the equipment (e.g., trucks, storage units) required to service the routes, assign the routes to driver-employees or hire new drivers to service the routes, provide the Union the information that it requested regarding the routes (to the extent it

has not already done so), and bargain with the Union regarding the decision to sell the routes. (Doc. 1-3.) Such a broad injunction is not necessary to preserve the Board's remedial power.

Petitioner argues that such broad and immediate relief is necessary in order "to preserve the employees' Section 7 rights and to prevent the nullification of the Board's final order." (Doc. 1-1 at 12.) The Board will be able to preserve the employees' bargaining rights and enter an effective order, however, regardless of whether an injunction is entered now. The Board will have the power, if it finds the Act has been violated, to order the company to rescind the sale and bargain with the Union. Moreover, according to the testimony at the hearing, all but two of the employees affected by the sales are still working for Mike-sell's as drivers. No drivers were laid off. (5/12/17 Transcript at 75:21-23.) The two drivers who left the company did so by choice—one because he did not like the traffic on his new route and the other because he found a "better job." (*Id.* at 52-53.) Thus, the vast majority of the employees whose rights are at issue are still at the company and in a position to bargain regarding the sale of the routes—should the Board afford them that opportunity.

The requested injunction would also impose a severe and undue hardship on Mike-sell's and its independent distributors. Mike-sell's already sold the equipment that it used to service the routes, so it would have to replace that equipment at a cost likely to greatly exceed the amount that it received from the liquidation. (Transcript at 152.) The company does not have four drivers who could service the routes, so it would have to invest time and resources in interviewing and hiring candidates for those positions. (*Id.* at 153.) It might also have to hire additional managers and warehouse personnel. (*Id.*) If Mike-sell's were unable to service the routes and had to abandon them, it would likely have a ripple effect on the demand for its products in other territories as well. (*Id.*)

The hardship to the independent distributors who purchased the routes would be severe. Two distributors, Charles Morris and Lisa Krupp, testified that they invested substantial capital in their businesses in order to service and develop the routes. Morris, who owns and manages a distribution company, purchased an additional truck, rented additional storage space, and hired two independent operators for the two routes that he purchased from Mike-sell's. (*Id.* at 164-67, 176.) Morris has marketed Mike-sell's products to expand its customer base—and with it his profit margin—and modified his business to most efficiently distribute Mike-sell's products alongside the other brands that he distributes. (*Id.* at 170, 180.) If Mike-sell's were ordered to rescind its distribution agreement with his company, Morris would lose the revenue from distributing Mike-sell's products, but still have to bear the costs of the additional truck and storage space. He would have to terminate three independent operators, not just the two that he hired for the Mike-sell's routes, due to the extent to which he has grown the Mike-sell's portion of his business. Morris would also have to reconfigure his existing routes to adjust for the loss of Mike-sell's products.

Krupp was a driver for Mike-sell's for nine years (with a one-year break) before she decided to purchase two routes from Mike-sell's and start her own distribution business. (*Id.* at 191-92.) Krupp testified that a benefit of owning her own business has been that, as a single mother with three kids, she does not have to work two jobs to support her family anymore. (*Id.* at 206.) Krupp's initial investment included purchasing the routes, a truck, commercial auto insurance, business insurance and renting storage space. (*Id.* at 198-200.) She also employed her son as a salaried employee to help her service the routes. (*Id.* at 205-6.) If Mike-sell's were ordered to rescind its distribution agreement with Krupp, her business would fail because it has no other customers. (*Id.* at 206.) Her son would lose his job and she would have to find another

way to support her family. (*Id.*) Krupp was confident that she would be able to do so, but it would no doubt be a difficult and stressful transition. (*Id.*)

In contrast, denying the injunction will not impose as severe a hardship on the Union and the employees that it represents. The employees who testified at the hearing described dissatisfaction with the changes in the routes that they service and frustration with the effectiveness of their Union representation. Among other complaints, drivers are upset that it is taking longer to service their territories due to the sale and consolidation of their routes. The drivers admitted that they are earning more money on the consolidated routes, but the additional money is not sufficient to compensate for the longer hours. Jerry Lake, one of the employed drivers, estimated that, if you computed their compensation as an hourly rate (they are actually paid by commission on sales volume), then they would simply be making the same hourly rate but working more hours each day. (*Id.* at 59-60, 66.) Lake was unhappy with his new arrangement, as are other drivers.

Petitioner also argues that entering the injunction would be just and proper because it would help restore employees' relationship with the Union. There was testimony, however, that issues unrelated to the underlying grievance in this case are likely the chief cause of the deterioration of that relationship. It would not be just or proper to enter an injunction to improve Union relations when the violations to be enjoined were not responsible for the damage to those relations—or, at least, were not primarily responsible.

In addition, over the last approximately fourteen years, Mike-sell's sold many routes to independent distributors without any objection from the Union. In 2002, for example, it sold four routes in Portsmouth, Ohio. In 2012, it sold almost 30 routes in Cincinnati, Sabina, and Columbus, Ohio. In 2013, it sold at least four routes in Springfield, Ohio. In light of this

history, Mike-sell's could have reasonably believed that its practice did not violate its obligation to the Union and that any such objection was not well-founded. The independent distributors who purchased the routes in 2016 also could have reasonably relied on Mike-sell's past sales as evidence that their purchases would be honored.

It should also be noted that Mike-sell's provided advance notice to the Union of its proposed route sales and consistently offered to bargain with the Union regarding the effects of those sales. This is not a case, in other words, where the employer flouted its obligations under the Act. In this respect, the Court further notes that Mike-sell's position in this case has substantial support in the caselaw, regardless of what the Board ultimately decides.

For all of these reasons, the entry of Petitioner's requested relief would not be just and proper in this case.

## IV. <u>CONCLUSION</u>

As Petitioner has failed to establish that entry of the requested relief would be just and proper, the Court **DENIES** the Petition (Doc. 1) for entry of a preliminary injunction. This case shall be **TERMINATED** on the Court's docket.

**DONE** and **ORDERED** in Dayton, Ohio, this Friday, May 26, 2017.

s/Thomas M. Rose
_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE